**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| PATRIOT HOMES, INC., *et al.*,[1] | ) | Case No. 08-33347-hcd |
| Debtors. | ) | (Jointly Administered) |

**ORDER AUTHORIZING SALE OF TEXAS PROPERTY**

On the Debtors' motion (Docket No. 674) for an order authorizing the Debtors to sell the property commonly known as 1001 W. Loop 340, Waco, Texas 76712 (the "*Texas Property*") pursuant to certain bidding procedures (the "*Sale Motion*");[2] the Court, having considered the pleadings, and after due deliberation and good and sufficient cause appearing therefor, it is hereby ORDERED:

1. Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to sell the Texas Property to the ABDI Family Trust (the "*Buyer*") upon the terms and subject to the conditions set forth in the purchase agreement (the "*Agreement*") attached hereto as Exhibit A, with such non-material modifications or amendments as may be agreed by the parties.

2. The Debtors and the Buyer are hereby authorized to take all actions and execute all documents and instruments that the Debtors and the Buyer deem necessary or appropriate to implement and effect the transactions contemplated by the Agreement.

3. The sale of the Texas Property shall be free and clear of liens (other than liens created by the Buyer and as otherwise provided herein) pursuant to section 363(f) of the

[1] The Debtors are the following entities: Patriot Homes, Inc. ("*Patriot*"), Patriot Homes of Texas, L.P. ("*Patriot Homes of Texas*"), Patriot Sales, Inc. ("*Patriot Sales*"), Patriot Manufacturing Inc. ("*Patriot Manufacturing*"), Patriot Acceptance Corporation ("*Patriot Acceptance*"), Patriot Asset Protection, Inc. ("*Patriot Asset*"), Patriot General, Inc. ("*Patriot General*"), and Patriot Texas Mfg. Limited, Inc. ("*Patriot Mfg*").

[2] Capitalized terms not defined herein shall have the same meaning ascribed in the Sale Motion.

Bankruptcy Code, whether known or unknown, including, but not limited to, any of the Debtors' creditors, vendors, suppliers, employees, or lessors, with all such liens transferring and attaching to the proceeds of the sale, with the same validity, priority, force, and effect that the liens had on the Texas Property immediately prior to closing, and the Buyer shall not be liable in any way (as successor entity or otherwise) for any claims that any of the foregoing or any other third party may have against any of the Debtors.

4. Upon the closing of the sale and the actual receipt by the Debtors of the proceeds of the sale pursuant to the Agreement and this Order, each of the Debtors' creditors is authorized and directed to execute such documents and take all other action as may be necessary to release their liens on the Texas Property, as may have been recorded or may otherwise exist.

5. This Order (a) shall be effective as a determination that, upon the closing, all liens existing as to the Texas Property prior to the closing have been unconditionally released, discharged, and terminated on the Texas Property (with such liens transferring and attaching to the proceeds of the sale, with the same validity, priority, force, and effect that the liens had on the Texas Property immediately prior to closing), and that the conveyances described herein and in the Agreement have been effected; and (b) are and shall be binding upon and govern the acts of all entities and persons, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may

be required to report or insure any title or state of title in the Texas Property. The Debtors are hereby authorized to file, register, or otherwise record with any and all local and state taxing and other governmental authorities this Order which shall constitute due and sufficient evidence that, upon the closing, all liens existing as to the Texas Property prior to the closing have been unconditionally released, discharged, and terminated as to the Texas Property only (as set forth in this Order); provided, however, that any statutory ad valorem real and personal property tax liens securing taxes for calendar year 2009 shall remain attached to the Texas Property until the time such 2009 taxes are paid.

6.  If any person or entity that has filed financing statements or other documents or agreements evidencing liens on the Texas Property shall not have delivered to the Buyer prior to the date of the transfer, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all liens, or other interests which the person or entity has with respect to the Texas Property, the Debtors are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Texas Property.

7.  Subject to the payment by the Buyer to the Debtors pursuant to section 363 of the Bankruptcy Code of the consideration provided for in the Agreement, the sale of the Texas Property by the Debtors to the Buyer shall constitute a legal, valid, and effective transfer of the Texas Property and shall vest the Buyer (or its designees) with all right, title, and interest of the Debtors in and to the Texas Property free and clear of all liens pursuant to section 363(f) of the Bankruptcy Code, effective as of the closing with all such liens transferring and attaching to the proceeds of the sale, with the same validity, priority, force, and effect that the liens had on the Texas Property prior to closing.

8. The sale of the Texas Property to the Buyer under the Agreement will constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of all applicable jurisdictions, including, but not limited to, the laws of Texas.

9. The Buyer is hereby granted all of the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code and a good faith creditor under section 364(e) of the Bankruptcy Code.

10. This Court shall retain exclusive jurisdiction to interpret and enforce the provisions of the Agreement and this Order in all respects and further to hear and determine any and all disputes between the Debtors and/or the Buyer, as the case may be, including, without limitation, compelling actual payment by the Buyer of the consideration for the Texas Property to the Debtors pursuant to and in accordance with the Agreement and this Order, compliance by the Buyer with the terms of this Order and the Agreement, delivery of the Texas Property to the Buyer, protecting the Buyer against any liens, claims, interests, obligations, and encumbrances against the Debtors or the Texas Property; provided, however, that in the event the Court abstains from exercising or declines to exercise such jurisdiction with respect to the Agreement or this Order, such abstention, refusal, or lack of jurisdiction shall have no effect upon, and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

11. The provisions of this Order are non-severable and mutually dependent.

Dated: August 26, 2009

UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

**Agreement**

**ASSET PURCHASE AGREEMENT**

This Asset Purchase Agreement (the "*Agreement*") is made as of ~~June~~ July 20 2009, (the "*Effective Date*"), by and between Patriot Homes of Texas, L.P., a Texas limited partnership (the "*Seller*"), and ABDI Family Trust and/or its assigns, a Texas limited partnership (the "*Buyer*"), with principal offices located at California.

**RECITALS**

A. Seller has commenced a Chapter 11 case in the United States Bankruptcy Court (the "*Bankruptcy Court*") for the Northern District of Indiana, jointly administered under Case No. 08-33347 and has continued in the possession of its asset and in the management of its business under U.S. Bankruptcy Code (the "*Code*") §§ 1107 and 1108.

B. Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all the asset identified in Section 1.2 below, on the terms and conditions set forth in this Agreement, pursuant to § 363 of the Code.

NOW, THEREFORE, in consideration of the above recitals and the mutual covenants hereinafter set forth, Buyer and Seller hereby agree as follows:

1. **PURCHASE AND SALE OF ASSET/BUYER'S INVESTIGATIONS/TITLE AND SURVEY.**

1.1 Agreement to Sell and Purchase Asset. Subject to the terms and conditions of this Agreement, and in reliance on the representations, warranties and covenants set forth in this Agreement, Seller agrees to sell, assign, transfer and convey to Buyer at the Closing (as defined in Section 2.4 below), and Buyer agrees to purchase and acquire from Seller at the Closing, all of Seller's right, title and interest in and to the land and improvements thereon and all appurtenances thereto (the "*Real Property*") and all other assets of Seller identified in Section 1.2 below (collectively, the "*Asset*"). The Asset will be sold, assigned, transferred and conveyed to Buyer on the Closing Date "as is" and "where is", with no representations or warranties other than those specifically set forth below.

1.2 Asset Defined. As used in this Agreement, the term "*Asset*" means, collectively, Seller's right, title and interest in and to the assets listed in Exhibit A attached hereto, as well as the Real Property.

1.3 Asset Transfer; Passage of Title; Delivery.

(a) Title Passage. Upon the Closing, Seller's right, title and interest in the Asset shall pass to Buyer by quitclaim deed; and Seller shall make available to Buyer possession of the Asset as provided in Section 1.3(b), and shall further, upon Buyer's request, execute such other instruments of conveyance as counsel for Buyer may reasonably deem necessary to effect or evidence the transfers contemplated hereby. Any such additional documents shall be prepared by and all related costs borne exclusively by Buyer.

(b) Delivery of Asset. On the Closing Date (as defined in Section 2.4), Seller shall make available to Buyer possession of the Asset.

1.4 Buyer's Investigation of the Property.

(a) Commencing on the Effective Date and terminating at 5:00 pm on the thirtieth (30th) day thereafter (such period being referred to hereunder as the "*Property Investigation Period*"), Buyer, its contractors and other agents shall have the right to enter upon the Real Property for the purpose of inspecting and assessing same and to perform any such tests, inspections, investigations, inquiries, surveys, engineering studies, environmental assessments and other non-invasive tests as Buyer shall deem appropriate, including but not limited to, water reclamation district approval, environmental testing, and structural testing. Any and all costs and expenses relating to such investigations shall be at the sole cost of the Buyer.

(b) In the event that there is a material defect in the physical condition of the Real Property, Buyer shall have the right to elect to terminate this Agreement by delivering written notice of termination, specifying the material defect, to Seller not later than the end of the Property Investigation Period, in which event the Earnest Money shall be returned to Buyer. If Buyer fails to provide any such notice prior to the end of the Property Investigation Period, Buyer's right to terminate shall be deemed waived and this Agreement shall remain in full force and effect.

1.5 Title and Survey.

(a) Conveyance of Title: Seller agrees to deliver to Buyer a quitclaim deed conveying to the Buyer, or as it directs, all of Seller's right, title and interest in the Real Property.

(b) Commitment – Title Policy. Within fifteen (15) days after the Effective Date, Seller shall obtain and deliver to Buyer, at Buyer's cost, a title commitment (the "*Title Commitment*"), dated after the Effective Date, for an ALTA owner's title insurance policy (2006 policy form) for the Real Property in the amount of the Purchase Price from the Escrowee (also referred to herein as the "*Title Company*") wherein the Title Company shall commit to issue its ALTA owner's title insurance policy, in the full amount of the Purchase Price (the "*Title Policy*") subject only to (i) liens for taxes and special assessments not yet due and payable, (ii) restrictions imposed by applicable building, zoning and other codes, ordinances, statutes, laws, rules and regulations applicable to the Real Property, (iii) covenants, conditions and restrictions of record, public and utility easements of record, and roads and highways, and (iv) other imperfections of title that are not eliminated pursuant to the Final Order (as hereinafter defined) under 11 U.S.C. § 363 (collectively, the "*Permitted Encumbrances*"). To the extent within the Seller's possession, Seller shall use its best efforts to deliver to Buyer copies of all documents listed in the Schedule B of the Title Commitment within fifteen (15) days after the Effective Date. The cost of the base Title Policy shall be paid by Buyer. The cost of any endorsements to the Title Policy, any loan policy required by Buyer's lender, if any, together with any endorsements required by Buyer's lender, and all other charges related to Buyer's financing, if any, shall be paid by Buyer.

(c) Survey. Within fifteen (15) days after the Effective Date, Buyer, at Buyer's expense, [illegible] ALTA [illegible] survey of the Property ("Survey") prepared by a licensed surveyor ("Surveyor"), [illegible] shall be dated not earlier than the Effective Date and which shall be certified to Seller, Buyer, Buyer's lender (if any) and the Title Company, [illegible].

1.6 Defects and Cures. Buyer shall have until the expiration of the Property Investigation Period to notify Seller in writing of any objections that Buyer has to the Title Commitment or the Survey, other than the Permitted Encumbrances. Seller shall have up to fifteen (15) days following receipt of such notice within which to attempt, using good faith reasonable efforts, to cause such objections to be removed, waived, or insured over by the Title Company or otherwise addressed to Buyer's reasonable satisfaction. If Seller shall fail to have such objections [illegible] insured over by the Title Company or otherwise addressed to Buyer's satisfaction within the [illegible], Buyer shall, within ten (10) days following [illegible], either (a) terminate this Agreement, whereupon the Earnest Money shall be immediately [illegible] to Buyer and the Parties shall be released from further liability hereunder, or (b) take title to the Real Property subject to the conditions with respect to which Buyer has objected. If Buyer fails to provide any such notice within said 10-day period, Buyer shall be deemed to have elected to take title to the Real Property subject to the conditions with respect to which Buyer has objected. Notwithstanding the foregoing, in no event shall Permitted Encumbrances include any title exceptions pertaining to liens or encumbrances [illegible] which apply exclusively to the Real Property and which [illegible] by the payment of money and which shall, in any event, [illegible] of the Sale Order.

2. PURCHASE PRICE, DEPOSIT AND CLOSING.

2.1 Purchase Price. In consideration of the sale, transfer, conveyance and assignment of the Asset to Buyer at the Closing, Buyer shall pay by wire transfer Two Million Five Hundred Fifty Thousand Dollars ([illegible]) (the "Purchase Price") directly to each payee in the amounts as shown on the settlement statement prepared in connection with the Closing.

2.2 Earnest Money Deposit. Within [illegible] days following mutual execution of this Agreement by Buyer and Seller [illegible] filing a motion in the Bankruptcy Court for approval of this Agreement and the Overbid Procedures (as defined in Section 8 below), Buyer will promptly deposit, in escrow with [illegible] Home Abstract & Title Co. ("Escrowee"), the sum of Fifty Thousand dollars ($50,000.00) in a non-interest bearing account, to insure Buyer's good faith in pursuing the transactions contemplated by this Agreement (the "Earnest Money"). The Earnest Money will be credited towards the Purchase Price payable by Buyer at the Closing or shall be promptly returned to Buyer should Buyer not be the [illegible] buyer after completion of the Overbid Procedures (as defined in Section 8 below) or as otherwise set forth in this Agreement.

2.3 Condition Precedent to Closing. The sale by Seller and purchase by Buyer of the Asset is subject to prior issuance by the Bankruptcy Court of an order or orders which (i) authorize Seller to sell the Asset to Buyer; (ii) approve the sale and purchase of the Asset upon

the terms and subject to the conditions of this Agreement, and (iii) deny or otherwise resolve any objections to the proposed transaction in a manner reasonably acceptable to Seller and Buyer (collectively the orders of Bankruptcy Court referenced in subparagraphs (i) – (iii) inclusive are referred to as the "*Order*") and the expiration of all appeals of the Order (or expiration of the time for filing any such appeals if such appeal is not filed) without modification of such Order and without the entry of a stay of consummation of the sale and purchase transaction as set forth in this Agreement (the "*Final Order*"). Upon execution of this Agreement, Seller shall promptly file a motion with the Bankruptcy Court for approval of the sale to Buyer on the terms and conditions of this Agreement and approval of the Overbid Procedures (as defined in Section 8 below).

2.4    Closing. The closing (the "*Closing*") of the sale and purchase of the Asset shall take place within five (5) days after the Order becomes a Final Order, at the offices of Escrowee or at such other place and time as may be agreed upon by the parties hereto (the date on which the Closing occurs is hereinafter referred to as the "*Closing Date*"). The Closing shall occur not later than five (5) days from the entry of the Final Order, unless the Closing Date is extended by mutual agreement of Buyer and Seller for good cause.

3.    REPRESENTATIONS AND WARRANTIES OF BUYER.

Buyer hereby represents and warrants to Seller that all the following statements are true, accurate and correct:

3.1    Due Organization. Buyer is qualified, duly organized, validly existing, and in good standing under the laws of Texas. Buyer has all necessary power and authority to enter into this Agreement and all other documents that Buyer is required to execute and deliver hereunder, and holds or will timely hold all permits, licenses, orders and approvals of all federal, state and local governmental or regulatory bodies necessary and required therefor.

3.2    Power and Authority; No Default. Buyer has all requisite power and authority to enter into and deliver this Agreement and to perform its obligations hereunder. The signing, delivery and performance by Buyer of this Agreement, and the consummation of all the transactions contemplated hereby, have been duly and validly authorized by Buyer. This Agreement has been duly and validly executed and delivered by Buyer and constitutes its valid and binding obligation, enforceable against Buyer in accordance with its terms, subject to the laws relating to bankruptcy, insolvency and relief of debtors, and rules and laws governing specific performance, injunctions, relief and other equitable remedies.

3.3    Authorization for this Agreement. To the best of Buyer's knowledge, no authorization, approval, consent of, or filing with any governmental body, department, bureau, agency, public board, authority or other third party is required for the consummation by Buyer of the transactions contemplated by this Agreement.

3.4    Litigation. To the best of Buyer's knowledge, there is no litigation, suit, action, arbitration, inquiry, investigation or proceeding pending or threatened, before any court, agency or other governmental body against Buyer (or any corporation or entity affiliated with Buyer) which seeks to enjoin or prohibit or otherwise prevent the transactions contemplated hereby.

3.5     Financing. Buyer, at Closing, will have sufficient cash on-hand or available through existing liquidity facilities (without restrictions on drawdown that would delay payment of the Purchase Price) to make payment in full of the Purchase Price and make payment of any other amounts payable hereunder and to consummate the transactions contemplated by this Agreement.

4.     REPRESENTATIONS AND WARRANTIES OF SELLER AND BUYER'S ACKNOWLEDGMENT OF DISCLAIMERS.

Seller represents and warrants to Buyer that all of the following statements are true, accurate and correct:

4.1     Corporate Organization. Seller is a limited partnership duly organized, validly existing, and in good standing under the laws of the State of Indiana.

4.2     Power and Authority. Subject to approval of this Agreement by the Bankruptcy Court, Seller has all requisite power and authority to enter into and deliver this Agreement and to perform its obligations hereunder. The signing, delivery and performance by Seller of this Agreement, and the consummation of all the transactions contemplated hereby, have been duly and validly authorized by Seller.

4.3     Due Execution. This Agreement has been duly executed and delivered by Seller and, upon approval of this Agreement by the Bankruptcy Court, constitutes its valid and binding obligation, and enforceable against Seller in accordance with its terms, subject to the laws relating to bankruptcy, insolvency and relief of debtors, and rules and laws governing specific performance, injunctions, relief and other equitable remedies.

4.4     Title. Seller has good, valid and marketable title to the Asset with the full and unrestricted right to convey the Asset to Buyer upon approval by the Bankruptcy Court. Other than as set forth above, Seller sells, assigns, transfers and conveys all of its right, title and interest in and to the Asset to Buyer "as is" and "where is", with no representations or warranties as to merchantability, fitness or use.

4.5     Consents and Approvals. Except for receipt of the Final Order and to the best of Seller's knowledge, no authorization, approval, consent of, or filing with any governmental body, department, bureau, agency, public board, authority or other third party is required for the consummation by Seller of the transactions contemplated by this Agreement.

4.6     Litigation. To the best of Seller's knowledge, there is no litigation, suit, action, arbitration, inquiry, investigation or proceeding pending or threatened, before any court, agency or other governmental body against Seller (or any corporation or entity affiliated with Seller) which seeks to enjoin or prohibit or otherwise prevent the transactions contemplated hereby.

4.7     As-Is Sale; Disclaimers; Release.

(a)     Except as expressly stated herein, it is understood and agreed that Seller is not making and has not at any time made any warranties or representations of any kind or

character, express or implied, with respect to the Asset, including but not limited to, any warranties or representations as to merchantability or fitness for a particular purpose.

(b) Except as expressly stated herein, Buyer acknowledges and agrees that upon Closing Seller shall sell and convey all of its right, title and interest in and to the Asset to Buyer and Buyer shall accept the Asset "as is, where is." Buyer has not relied and will not rely on, and Seller is not liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Asset or relating thereto made or furnished by Seller or its representatives, to whomever made or given, directly or indirectly, orally or in writing, except as expressly stated herein. Buyer also acknowledges that the Purchase Price reflects and takes into account that the Asset is being sold "as is, where is."

(c) Buyer acknowledges to Seller that Buyer has had the opportunity and will have the opportunity, prior to Closing, to conduct such inspections and investigations of the Asset as Buyer deems necessary or desirable to satisfy itself as to the Asset and its acquisition thereof. Buyer further warrants and represents to Seller that Buyer will rely solely on its own review and other inspections and investigations in this transaction and not upon the information provided by or on behalf of Seller, or its agents, employees or representatives with respect thereto.

5. <u>TAXES AND EXPENSES OF SALE.</u>

5.1 Seller shall pay the cost of recording any releases required by the Title Company with respect to any encumbrances other than the Permitted Encumbrances, state, county and municipal transfer taxes, one-half (1/2) of the deed and money escrow charges and one-half (1/2) of the New York Style closing fees, and, except as otherwise provided herein, all other closing costs and expenses normally and customarily paid by sellers of real estate in the municipality in which the Real Property is located.

5.2 Buyer shall pay one-half (1/2) of the deed and money escrow charges, one-half of the New York Style closing fees, and, except as otherwise provided herein, all other closing costs and expenses normally and customarily paid by buyers of real estate in the municipality in which the Real Property is located.

5.3 From and after the Closing Date, Seller shall cooperate with Buyer and promptly sign and deliver to Buyer any and such additional documents, instruments, endorsements and related information and take actions as Buyer may reasonably request for the purpose of effecting the transfer of Seller's title to the Asset to Buyer, and/or carrying out the provisions of this Agreement; provided, however, that Seller shall be reimbursed for its reasonable costs and expenses incurred in providing such documents, instruments, endorsements or related information, which additional documents, instruments, endorsements or related information shall be prepared solely by and at the sole expense of Buyer.

6. <u>CONDITIONS TO CLOSING.</u>

6.1 <u>Conditions to Buyer's Obligations.</u> The obligations of Buyer hereunder shall be subject to the satisfaction and fulfillment of each of the following conditions, except as Buyer may expressly waive the same in writing:

(a) Final Order. Seller shall have received the Final Order.

(b) Accuracy of Representations and Warranties on Closing Date. The representations and warranties made by Seller in Section 4 hereof shall be true and correct in all material respects, on and as of the date given, and on and as of the Closing Date with the same force and effect as though such representations and warranties were made on and as of the Closing Date.

(c) Compliance. As of the Closing Date, Seller shall have complied in all material respects with, and shall have fully performed, in all material respects, all conditions, covenants and obligations of this Agreement imposed on Seller and required to be performed or complied with by Seller at, or prior to, the Closing Date.

(d) Delivery of Asset. Seller shall have made the Asset available to Buyer.

6.2 Conditions to Seller's Obligations. The obligations of Seller hereunder shall be subject to the satisfaction and fulfillment of each of the following conditions, except as Seller may expressly waive the same in writing:

(a) Final Order. Seller shall have received the Final Order.

(b) Accuracy of Representations and Warranties on Closing Date. The representations and warranties made by Buyer in Section 3 hereof shall be true and correct in all material respects, on and as of the date given, and on and as of the Closing Date with the same force and effect as though such representations and warranties were made on and as of the Closing Date.

(c) Compliance. Buyer shall have complied in all material respects with, and shall have fully performed, the terms, conditions, covenants and obligations of this Agreement imposed thereon to be performed or complied with by Buyer at, or prior to, the Closing Date.

(d) Payment. Buyer shall have transmitted by wire transfer and Seller and other payees shall have received payment of the Purchase Price.

7. CLOSING OBLIGATIONS/PRORATIONS AND ADJUSTMENTS

7.1 Buyer's Closing Obligations. At the Closing, Buyer shall deliver to Seller payment of the Purchase Price (subject to any credit for the Earnest Money pursuant to Section 2.2 above) by wire transfer to Seller and other payees designated by Seller.

7.2 Seller's Closing Obligations. At the Closing, Seller shall make available to Buyer the following:

(a) The Asset:

(b) The following documents:

(i) A Quitclaim Deed for the Real Property conveying to Buyer all of Seller's right, title and interest in the Real Property:

(ii) A Bill of Sale conveying to Buyer any personal property of Seller located on the Real Property, free and clear of any claims, liens, encumbrances or other interests of any kind.

(iii) The Title Policy, issued to Buyer by the Title Company or a suitably marked-up copy of the Title Commitment in the form required hereunder:

(iv) An affidavit of Seller conforming with the requirements of Section 1445 of the Internal Revenue Code, the Patriot Act, or any other law, statute or regulation affecting the Real Property or the transactions contemplated by this Agreement:

(v) An ALTA Statement, on Escrow Agent's standard form, executed by Seller;

(vi) A closing settlement statement (the "*Closing Statement*"), executed by Seller:

(vii) A Gap Undertaking for the New York Style Closing;

(viii) Duly executed counterpart of State, County and Municipal Transfer Tax Declarations, if any (the "Transfer Tax Declarations");

(ix) Seller shall provide a copy of the Final Order entered by the Bankruptcy Court authorizing conveyance of the Asset: and

(x) Deliver to Buyer or the Title Company such other documents as may be required by this Agreement or as a condition to the issuance of the Title Policy in the form required hereunder.

7.3 Prorations and Adjustments. All costs, expenses, obligations and income relating to the operation of the Real Property (except as hereinafter provided) shall be prorated between Seller and Buyer as of 12:01 am on the Closing Date and shall be final and not subject to re-proration. Whether amounts are allocable, for purposes of this Section 7.3, to periods before or after the Closing Date shall be determined in accordance with generally accepted accounting principles, using the accrual method. Without limiting the generality of the foregoing, the following items shall be prorated, adjusted or paid in the manner indicated:

(a) Real Estate, personal property, ad valorem and related taxes, levies and charges and assessments ("*Taxes*"). applicable to the Real Property for the year prior to the year in which Closing occurs shall be paid in full at the Closing, to the extent bills for same have been received, so that the Title Company shall indicate payment in full thereof on the Title Policy. Taxes for the year in which Closing occurs or which are not known and evidenced by a final bill from all appropriate taxing authorities, shall be prorated based on the most recent ascertainable full year tax bill multiplied by 110%.

(b)   All charges for utilities relative to the Real Property shall be paid by Seller to the Closing Date. Final meter readings shall be made on the Closing Date. Any deposits made by Seller shall be the Seller's property.

8.   **COMPETING BIDS.**

Buyer hereby acknowledges that under §363 of the Code Seller has a fiduciary responsibility to maximize the value of the Asset and that, pursuant to such responsibility, Buyer hereby expressly agrees that Seller may solicit and receive *bona fide* bids for the Asset from qualified third parties pursuant to the overbid procedures approved by the Bankruptcy Court (the "*Overbid Procedures*"). Seller shall propose and request that the Bankruptcy Court approve the following as part of the Overbid Procedures, but no such procedures shall be binding on Seller unless authorized and approved by the Bankruptcy Court.

8.1   Breakup Fee. If this Agreement is approved by the Bankruptcy Court, and Buyer is ready, willing and able to perform its obligations under this Agreement, but a *bona fide* competing bid for purchase of all or substantially all of the Asset is accepted by the Seller and approved by the Bankruptcy Court pursuant to the Overbid Procedures, Seller will pay Buyer a fee in the amount of Twenty-Five Thousand dollars ($25,000.00) (the "*Breakup Fee*") payable after a closing of a sale of the Asset to a competing bidder. The Breakup Fee shall have priority as an administrative expense under §507(a)(1) of the Code. In no event shall Buyer be entitled to the Breakup Fee if Buyer is in breach of this Agreement and has failed to satisfy a material condition performable by it under this Agreement.

8.2   Minimum Overbids. The initial overbid over the Purchase Price shall be in an amount that is $25,000.00 plus the Breakup Fee. All subsequent overbids shall be at least $25,000.00 over the immediate previous best offer. Buyer shall have the right to submit an overbid in response to any initial overbid or subsequent overbids. Buyer may include an amount equal to the Breakup Fee as cash consideration for purposes of any overbids by Buyer. In no event shall an Overbid be accepted until such time as Buyer has had an opportunity to submit an additional bid.

8.3   Overbid Period. The date set for initial overbids to be submitted to Seller shall be no less than two (2) days prior to the auction as approved by the Bankruptcy Court (the "*Overbid Deadline*").

8.4   Qualification to Overbid. All parties, except any party entitled to bid pursuant to Section 363(k) of the Code, seeking to submit overbids must qualify by providing evidence satisfactory to Seller of their financial ability to consummate a sale, delivering to Seller of a cashier's or certified check for an amount equal to the Ernest Money Deposit set forth in Section 2.2 above prior to the Overbid Deadline, and making representations substantially similar to Buyer's representations in Section 3 above.

8.5   Overbid Approval. The Seller or the secured creditor may dispute any overbid, except that offered by Buyer in the event of a competing *bona fide* competing bid.

9. **MISCELLANEOUS.**

9.1 Notices. Any notice required or permitted to be given under this Agreement shall be in writing and shall be personally delivered or sent by certified or registered United States mail, postage prepaid, or sent by nationally recognized overnight express courier or by facsimile transmission with proof of transmittal, and addressed as follows:

If to Seller:

Patriot Homes of Texas, L.P.

c/o: Sam Weidner

1585 Hanover Road

Lewistown, Montana 59457

With copy to:

KL Gates

c/o: Sven Nylen

70 West Madison, Suite 3100

Chicago, Illinois 60602

If to Buyer:

ABDI Family Trust,

c/o:

Address: 1275 Quarry

City/State/Zip: Corona, CA 92879

With copy to:

9.2 Entire Agreement. This Agreement, Exhibit A hereto (which is incorporated herein by reference) and any agreements to be executed and delivered in connection herewith, together constitute the entire agreement and understanding between the parties and there are no agreements or commitments with respect to the transactions contemplated herein except as set forth in this Agreement. This Agreement supersedes any prior offer, agreement or understanding between the parties with respect to the transactions contemplated hereby.

9.3 Amendment; Waiver. Any term or provision of this Agreement may be amended only by a writing signed by Seller and Buyer. The observance of any term or provision of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party to be bound by such waiver. No waiver by a party of any breach of this Agreement will be deemed to constitute a waiver of any other breach or any succeeding breach.

9.4 No Third Party Beneficiaries. Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or to give any person, firm or corporation, other than the parties hereto, any rights or remedies under or by reason of this Agreement.

9.5 Execution in Counterparts. For the convenience of the parties, this Agreement may be executed in one or more counterparts, including via facsimile or .pdf transmission, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

9.6 Benefit and Burden. This Agreement shall be binding upon, shall inure to the benefit of, and be enforceable by and against, the parties hereto and their respective successors and permitted assigns.

9.7 Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas (excluding application of any choice of law doctrines that would make applicable the law of any other state or jurisdiction) and, where appropriate, applicable federal law. The Bankruptcy Court shall have exclusive jurisdiction to enforce and interpret the terms of this Agreement and resolve any disputes and claims with respect thereto.

9.8 Severability. If any provision of this Agreement is for any reason and to any extent deemed to be invalid or unenforceable, then such provision shall not be voided but rather shall be enforced to the maximum extent then permissible under then applicable law and so as to reasonably effect the intent of the parties hereto, and the remainder of this Agreement will remain in full force and effect.

9.9 Attorneys' Fees. Should any legal proceeding be brought to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees to be fixed in amount by the Bankruptcy Court (including, without limitation, costs, expenses and fees on any appeal).

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, ... this Agreement by their duly authorized ...

SELLER: BUYER:

By: ____ By: ____

Name: Name: ABDI Family Trust

Entity: ABDI Family Trust

Title: Title: Trustee

CONTRACT RECIVED JULY 23, 2009 by: ____

EARNEST MONEY RECEIVED $50,000 JULY 23,2009 by: ____

HOME ABSTRACT & TITLE CO.
500 N. VALLEY MILLS DR., SUITE 111
WACO, TX 76710

HOME ABSTRACT AND TITLE COMPANY INCLUDING ITS ROLE AS ESCROW AGENT, IS NOT A PARTY TO THIS CONTRACT AND IS NOT BOUND BY THE TERMS AND CONDITIONS OF THIS CONTRACT.



**EXHIBIT A**
**Legal Description**

LOT 2, IN BLOCK 1 OF THE FINAL PLAT OF PATRIOT HOMES ADDITION TO THE CITY OF WACO, McLENNAN COUNTY, TEXAS, ACCORDING TO THE PLAT OF SAID ADDITION RECORDED IN VOLUME 581, PAGE 140 OF THE OFFICIAL PUBLIC RECORDS OF McLENNAN COUNTY, TEXAS.

A.P.N. 360713010001020 .

Common Address: 1001 West Loop 340
Waco, Texas 76712-6844

**AMENDMENT TO PURCHASE AGREEMENT**

Pursuant to the auction held on Tuesday, August 25, 2009, the purchase price for the former Patriot Homes facility is hereby amended to Two Million Seven Hundred and Fifty Thousand dollars ($2,750,000.00).

**AGREED AND ACCEPTED:**

| | |
|---|---|
| [signature] 8-25-09 | [signature] 8-25-09 |
| Patriot Homes of Texas, L.P. | Abdi Family Trust |
| Print Name: Sam Weidner | Print Name: Abraham Abdi |